# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 91 C 2092 | **DATE** | 3/23/2000 |
| **CASE TITLE** | Alexander Binzel Corporation, et al vs. Nu-Tecsys Corporation, et al | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Enter Memorandum Opinion and Order. Binzel U.S.'s motion to amend the judgment (Doc. 297-1) is granted; Binzel U.S.'s motions for judgment as a matter of law (Doc. 298-1) and a new trial (Doc. 298-2) are denied; and Nu-Tecsys' motions for attorneys' fees and enhanced and punitive damages (Doc. Nos. 314-1, 2, 3) are denied. The court further orders that judgment against Binzel Germany be vacated, and that the award be reduced from $4 million to $2.34 million. Both parties' motions for directed verdict (Doc. 289-1) and (Doc. No. 290-1) are denied as moot. Finally, Nu-Tecsys' motion to lift the stay of judgment (Doc. 319-1) pursuant to FED. R. CIV. P. 62(b) is granted without prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 5 | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | MAR 2 4 2000 | | |
| | Notified counsel by telephone. | | date docketed | | 321 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 3/23/2000 | | |
| ETV | courtroom deputy's initials | 00 MAR 23 PM 4: 45 | date mailed notice | | |
| | | | ETV | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ALEXANDER BINZEL CORPORATION )
AND ALEXANDER BINZEL GMBH & )
CO., KG, )
                             )
      Plaintiffs/Counter-Defendants, )
                             )
    v.                      )      No. 91 C 2092
                             )
NU-TECSYS CORPORATION AND )      Judge Rebecca R. Pallmeyer
KARL-HEINZ BINZEL, )
                             )
      Defendants/Counter-Plaintiffs. )

## MEMORANDUM OPINION AND ORDER

The parties to this case are a well-known German manufacturer of welding equipment and an American corporation established by the son of the German company's founder. On April 8, 1991, Alexander Binzel Corporation ("Binzel U.S.") and Alexander Binzel GmbH ("Binzel Germany") sued Nu-Tecsys Corporation ("Nu-Tecsys") and its President, Karl-Heinz Binzel ("Karl-Heinz") alleging Lanham Act violations, common law trademark infringement, unfair competition and violations of the Illinois Uniform Deceptive Trade Practices Act. Binzel's claims related to Nu-Tecsys' production and sale of high-tech welding guns. Nu-Tecsys filed four counterclaims, alleging violations of the Lanham Act, common law unfair competition, violations of the Illinois Uniform Deceptive Trade Practices Act and Illinois Consumer Fraud and Deceptive Business Practices Act, and intentional interference with prospective economic advantage. Nu-Tecsys' claims arise from Binzel U.S.'s distribution of a disparaging letter at a trade show resulting in business detriment to Nu-Tecsys. After the

jury rendered a verdict against Binzel U.S. on its claims and in favor of Nu-Tecsys on its counterclaims, Binzel U.S. moved to amend the judgment, for judgment as a matter of law on Nu-Tecsys' counterclaims, or in the alternative, for a new trial. Nu-Tecsys simultaneously filed post-trial motions seeking enhanced damages, punitive damages and attorneys' fees. For the reasons set forth below, Binzel U.S.'s motions for judgment as a matter of law and for a new trial are denied and its motion to amend the judgment is granted; Nu-Tecsys' motions for enhanced and punitive damages and fees are denied.

## FACTUAL BACKGROUND

The protracted procedural history relating to this dispute between Karl-Heinz and the company founded by his father has already been set forth by this court in its earlier ruling on Plaintiffs' motion to dismiss and Defendants' motion for summary judgment. *See Binzel v. Nu-Tecsys Corp.*, No. 91 C 2092, 1999 WL 166972, at *1 (N.D. Ill. Mar. 23, 1999). Furthermore, the parties are familiar with the facts as they were presented at trial. For purposes of this opinion, the court will now focus only on the facts that relate to Nu-Tecsys' counterclaims. Moreover, references in this opinion to "Counter-Defendant" are references to Binzel U.S. only; likewise, references to "Counter-Plaintiff" are references to Nu-Tecsys only.[1]

Binzel U.S. is the United States distributor and assembler of genuine Binzel welding

---

[1]     As discussed *infra*, the jury rendered a verdict in favor of Defendant Nu-Tecsys Corporation only. The jury concluded, further, that Binzel Germany was not liable for the wrongful conduct alleged by Nu-Tecsys. (Verdict Form.)

equipment manufactured by Binzel Germany. Karl-Heinz is the former president and part-owner of Binzel U.S., and is now the president and owner of Nu-Tecsys, a corporation he established in 1986 to manufacture and sell welding guns. (Tr. 522-24.) From 1986 until early 1990, Binzel Germany, and Binzel affiliates in Scandinavia and Australia supplied Binzel parts and complete welding equipment to Nu-Tecsys, which Nu-Tecsys sold to the consumer market. (Tr. 526-27.) In September 1990, Nu-Tecsys began manufacturing and selling Metallic Inert Gas ("MIG") welding guns, a type of welding gun that Binzel U.S. also manufactured. (Tr. 586, 591.) In this lawsuit, filed April 8, 1991, Binzel U.S. claimed trade dress rights in the shape and color of Nu-Tecsys guns, and alleged that Nu-Tecsys infringed on its MIG design.

Nu-Tecsys filed unfair competition counterclaims against Plaintiff. At trial, Nu-Tecsys presented three principal pieces of evidence to establish Binzel U.S.'s anti-competitive conduct. First, Binzel U.S. distributed a letter at a trade show in Detroit, Michigan, on April 16, 1991 (the "Detroit Letter"). (Def. Ex. 1001.) The letter contained three phrases which Nu-Tecsys alleged were false and misleading: (1) "The MIG guns marketed by Nu-Tecsys [sic] Corporation are not produced or endorsed by Alexander Binzel Corporation of Frederick, Maryland[;]" (2) "This action was taken to protect users of original Binzel MIG guns from counterfeit product[;]" and, finally (3) a description of Binzel U.S.'s exclusive rights to distribute "copies and/or colorable imitations of the red-handled and blue-handled Binzel MIG welding tools and other Binzel trade dress, the Binzel model and part numbers, and products partially assembled from Binzel parts." (*Id.*) Nu-Tecsys also argued that testimony

3

by William Bridges ("Bridges"), the former president of Binzel U.S., evidenced Counter-Defendant's anti-competitive conduct. Specifically, Nu-Tecsys points to Bridges' testimony that he "intimated" to customers that they would be "cut-off" if they purchased goods from Nu-Tecsys, and that throughout his tenure at Binzel U.S., he "never" stopped making such intimations. (Tr. 885-86.) Finally, when questioned about whether he was involved in the production of any letters containing such intimations, Bridges testified that he was not. (Tr. 887-88.) Nu-Tecsys impeached Bridges on that testimony by producing a letter distributed by Binzel Canada (Def. Ex. 1122) (the "Canada Letter"), and drafted by Bridges in his own handwriting. (Def. Ex. 1123.) Nu-Tecsys argued that this letter, which read, "I wish to inform you of some recent developments that could seriously impact your business and your relationship with our joint customers," constituted unfair competition. (Tr. 1297.)

The jury entered judgment in favor of Nu-Tecsys on its counterclaims and awarded damages in the amount of $4 million. The $4 million judgment consisted of $1.81 million in Nu-Tecsys' lost profits and $3.03 million in Binzel U.S.'s wrongful profits, reduced by the jury to $4 million to account for any overlap. It is this judgment and damages award that Binzel U.S. now challenges.

## DISCUSSION

A number of post-trial motions are before the court. The court will address each in turn.

### I. Counter-Defendant's Motion for Judgment as a Matter of Law

Binzel U.S. urges this court to enter judgment in its favor on Nu-Tecsys'

4

counterclaims, arguing that the factual bases for the jury's finding of liability are insufficient as a matter of law to support the jury's verdict. Specifically, Binzel U.S. argues that the Detroit Letter provides no basis for liability, first, because it was issued as publicity incidental to the lawsuit, and is therefore privileged by the *Noerr-Pennington* doctrine, and, second, because the statements in the letter were not false or misleading. Next, Binzel U.S. argues that Bridges' "intimation" testimony is insufficient to sustain a verdict of unfair competition or intentional interference with Nu-Tecsys' prospective economic advantage because a manufacturer has the freedom to exercise discretion in deciding with whom to deal.

## A.   Standard of Review

Judgment as a matter of law is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." FED. R. CIV. P. 50(a)(1); *see also Lane v. Hardee's Food Systems, Inc.*, 184 F.3d 705, 706 (7th Cir. 1999). When deciding a motion for judgment as a matter of law, the court may not resolve any conflict in the testimony nor weigh the evidence. *See id.* Instead, the court must view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party, and determine whether substantial evidence, and not a mere scintilla of evidence, could support a jury verdict. *See Willis v. Marion County Auditor's Office*, 118 F.3d. 542, 545 (7th Cir. 1997). Nevertheless, if "there is any basis upon which a reasonable jury could reach the conclusion that it did," the verdict must be upheld. *See Frazier v. Norfolk & W. Ry. Co.*, 996 F.2d 922, 924 (7th Cir. 1993).

### B.  The Detroit Letter and the *Noerr-Pennington* Doctrine

Binzel U.S. argues that Nu-Tecsys' counterclaims are barred by the *Noerr-Pennington* doctrine because the lawsuit itself and any incidental publicity, namely the Detroit Letter, are privileged activity.  The *Noerr-Pennington* doctrine provides immunity from liability arising out of the filing and maintaining of a civil lawsuit, so long as the litigation is not a sham.  *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56-57 (1993).  The Supreme Court has defined "sham" litigation as involving a lawsuit that is both (1) objectively baseless, and (2) intended as an anticompetitive weapon.  *See id.* at 60-61.

Most courts to consider the issue have extended *Noerr-Pennington* immunity to shield non-judicial acts that are "reasonably and normally attendant upon protected litigation." *See, e.g., Matsushita Elecs. Corp. v. Loral Corp.*, 974 F. Supp. 345, 359 (S.D.N.Y. 1997) (extending immunity to infringement warning letters sent to customers of defendants) (quoting *Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983) (citing cases)).  Some cases have extended the immunity to attendant publicity and to letters threatening court action. *See, e.g., Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 182 F.3d 1132, 1136 (10th Cir. 1999) (extending immunity to letters threatening suit for alleged infringement); *Thermos Co. v. Igloo Products Corp.*, No. 93 C 5826, 1995 WL 842002, at *4-5 (N.D. Ill. Sept. 27, 1995) (extending immunity to cease and desist letters sent to alleged infringers); *Aircapital Cablevision, Inc. v. Starlink Communications Group*, 634 F. Supp. 316, 325-26 (D. Kan. 1986) (extending immunity to press releases publicizing the lawsuit and threatening further legal

action). *But see Laitram Mach., Inc. v. Carnitech A/S*, 901 F. Supp. 1155, 1161 (E.D. La. 1995) ("The *Noerr-Pennington* doctrine does not extend to sending letters to a competitor's customers alleging violation of trade secrets and infringement of patents."). In instances involving attendant publicity, a party who "has probable cause to threaten litigation and makes no assertions beyond the legal and factual bases [of the suit] may enjoy *Noerr-Pennington* immunity[.]" *See Cardtoons*, 182 F.3d at 1139.

Binzel U.S. contends that the Detroit Letter was issued to Nu-Tecsys' customers incident to the lawsuit, and therefore is not actionable. To the extent that Nu-Tecsys suggests that the lawsuit was "sham" litigation, the court finds this argument untimely. At trial, Nu-Tecsys disavowed any such claim in open court, and conceded that a finding of liability on the counterclaims cannot be based merely on the filing and maintenance of the lawsuit.[2] (Tr. 968-71 ("[T]he bringing of the suit itself is not part of this case[.]").) The remaining question, then, is whether the statements in the Detroit Letter constitute assertions beyond the legal and factual bases of the lawsuit, and are therefore not privileged.

Nu-Tecsys contends that the Detroit Letter is not entitled to *Noerr-Pennington* immunity for three reasons: (1) Binzel U.S. falsely claimed exclusive rights in its trade dress; (2) the statement that Binzel U.S. did not produce or endorse the welding guns marketed by Nu-Tecsys is misleading; and (3) Binzel U.S.'s characterization of Nu-Tecsys' products as

---

[2]     The court notes its discomfort in considering the possibility that a lawsuit that has clogged the federal court system and absorbed the attention of several lawyers and judges for nearly ten years could be a sham.

"counterfeit" is false. These arguments implicate the merits of Nu-Tecsys' counterclaims, and therefore, the court will consider the jury's finding of liability on these issues.

## C.   Evidence Supporting Jury's Lanham Act Finding

In order to prevail on its Lanham Act claim, Nu-Tecsys was required to show that the Detroit Letter was "literally false, or if literally true or ambiguous, that it [was] 'misleading in context, as demonstrated by actual consumer confusion.'" *See BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1089 (7th Cir. 1994) (quoting *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992)). The court instructed the jury on this standard, as well as on the *Noerr-Pennington* defense.[3] (Tr. 1315, 1318, 1327.)   The court also instructed the jury on the right of a trademark owner to defend against infringement as follows:

> the owner of a trademark or trade dress has a right to defend itself against infringement and to warn purchasers from an alleged infringer that they, too, might be held liable. That right, however, is limited. A trademark or trade dress owner may not send out infringement letters that contain false statements or that are issued in bad faith. Whether that portion of the letter was proper does not depend on the merits of [Binzel U.S.'s] claim, as long as [Binzel U.S.] believed at the time the letter was sent that its claims were meritorious.

(Tr. 1317.) In answer to specific interrogatories, the jury found that the Detroit Letter

---

[3]   Both parties spend some time arguing whether erroneous jury instructions are sufficient to warrant judgment as a matter or law, or whether a party waives this post-trial argument when that party failed to object to the instructions at the time they were given. In fact, the jury was instructed only on the "sham" portion of the *Noerr-Pennington* defense, and not on the attendant publicity theory. Oddly, Binzel U.S. never argues that the judge improperly instructed the jury on the *Noerr-Pennington* defense. Indeed, *Nu-Tecsys* corrected the court on the *Noerr-Pennington* defense, and the court reinstructed the jury, still omitting the attendant publicity theory, without objection from Binzel U.S. (Tr. 1325-27.)

contained false or misleading statements, that it contained disparaging statements, and that the statements were made in bad faith. (Verdict Form, Questions B1-B3.) If there is a legally sufficient basis for a reasonable jury to find Lanham Act liability, and to reject both the *Noerr-Pennington* defense, and the right of a trademark owner to defend itself against infringement, the verdict will stand.

The Detroit Letter stated: "This action was taken to protect users of original Binzel MIG guns from counterfeit product." Focusing on the term "counterfeit," Binzel U.S. argues that the statement is not false because the term denotes "not genuine or authentic" as defined by *Webster's Third New International Dictionary*. In other words, Binzel U.S. argues that Nu-Tecsys' product was counterfeit, or inauthentic, because it was made with Binzel parts. Nu-Tecsys counters, arguing that the term has a common sense meaning of "fake," a meaning the jury could have adopted in making its liability determination.

During the hearing on instructions for the jury, the court rejected Binzel U.S.'s attempt to enter a "legal" definition of the word "counterfeit" in the jury charge. Instead, the court ruled that the meaning of counterfeit was a matter for argument. (Tr. 1172-75.) Binzel U.S. offered the dictionary definition into evidence, and the court took judicial notice of that definition. (Tr. 1001-02.) In making its closing arguments, Binzel U.S. argued that this definition that should apply to the statement in the Detroit Letter. (Tr. 1252 ("[T]his looks like a genuine Binzel gun, but it's not genuine or authentic. It's not the real thing. It fits within the definition of counterfeit.").) Nu-Tecsys argued what is characterizes as the "common sense" meaning; that the guns were genuine Nu-Tecsys guns with some Binzel

parts, not fake Binzel guns. (Tr. 49-50, 1267 ("What do you think of when you hear counterfeit? . . . Fake . . . .[Y]ou don't need a dictionary to know what counterfeit means.").) The court further instructed the jury to consider the evidence "in light of your own observations and experiences in life." (Tr. 1306.)

The jury was free to adopt the common sense meaning, and find the statement in the letter to be actually false, and therefore actionable under the Lanham Act. A reasonable jury could have found that Binzel U.S.'s label of Nu-Tecsys' product as "counterfeit" was literally false. The counterfeit statement in the Detroit Letter supports a finding of liability. Notably, Binzel U.S. never alleged that Nu-Tecsys engaged in counterfeiting. (Def. Exs. 1067, 1068; Tr. 50-51, 868.) Therefore, because the court has determined that the jury could reasonably conclude that the counterfeit statement was literally false, and because Binzel U.S. never charged Nu-Tecsys with counterfeiting Binzel guns, Binzel U.S. made assertions in the Detroit Letter that go beyond the legal and factual bases of the suit. Therefore the Detroit Letter is not entitled to *Noerr-Pennington* immunity *See Cardtoons*, 182 F.3d at 1139.

With respect to the counterfeit statement, Binzel U.S. makes a last ditch effort after the trial to argue that the statement is not actionable under Illinois law on unfair competition, product disparagement or intentional interference with prospective economic advantage. Binzel U.S. contends that the counterfeit statement is one of opinion, and cannot therefore form the basis of a fraud action. *See Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill.App.3d 606, 620, 663 N.E.2d 1, 10-11 (1st Dist. 1996).

Relying on a number of distinguishable cases, Binzel U.S. suggests that the Detroit

Letter employed the art of hyperbole in referring to the Nu-Tecsys product as counterfeit. In *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 729 (1st Cir. 1992), the statements challenged by the plaintiff appeared in a "regularly run theater column, a type of article generally known to contain more opinionated writing than the typical news report." (referring to language describing a production of Phantom of the Opera as "a rip-off, a fraud, a scandal, a snake-oil job"); *accord McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987) (statements in a newspaper article used a style that "puts the reader on notice that the author is giving his views . . . unlikely to convey the impression that an imprecise and unverifiable statement is meant to be a statement of fact."). In *Coastal Abstract Serv., Inc. v. First Amer. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999), the court held that the statement that a competitor was "too small" to handle a large account was "vague and subjective." In the same case, the court held that the statement that the competitor was not "paying its bills" was actionable under the Lanham Act. *See id.* at 732.

All of these statements in the cited cases are distinguishable from the counterfeit statement made in this case. The Detroit Letter exhibited an entirely factual tone, and the counterfeit statement is embedded within that context. Indeed, Bridges specifically testified that it was written to "set the facts straight." (Tr. 953.) In cataloguing the events and actions of the pending litigation, the Detroit Letter explained to Nu-Tecsys customers that "[t]his action was taken to protect users . . . from counterfeit product." Nothing in that statement, especially in the context of the Letter as a whole, hints at hyperbole or opinion.

Because the court has concluded that the counterfeit statement in the Detroit Letter

11

supports a verdict finding that the letter contained false statements, and that the Letter is not entitled to *Noerr-Pennington* immunity, the court need not determine whether the other two statements at issue were false or misleading. Therefore, the court need not determine whether Nu-Tecsys made a showing of actual consumer confusion. *See B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971-72 (7th Cir. 1999)(citations omitted).

### D. Evidence Supporting Jury's Verdict on Illinois Unfair Competition and Tortious Interference Claims

Binzel U.S. next argues that the intimations made by Bridges to Nu-Tecsys distributors and customers constituted privileged acts of competition. Nu-Tecsys counters that the Detroit Letter alone supports a finding of liability on these claims, but that evidence of intimidation on the part of Binzel U.S. further supports that finding.

On Nu-Tecsys' claim for unfair competition and intentional interference with prospective economic advantage, Nu-Tecsys had the burden of proving that (1) Nu-Tecsys had a reasonable expectation of entering into a valid business relationship; (2) Binzel U.S. knew of the prospective business relationship; (3) Binzel U.S. purposefully interfered to defeat or diminish this legitimate expectation; and (4) the interference caused damages to Nu-Tecsys. *See Soderlund*, 278 Ill.App.3d at 615, 663 N.E.2d at 7-8. There is a privilege to engage in business and to compete, so long as when diverting business from a competitor, one is not solely motivated by ill will. *Id.* Acts of competition which are never privileged include fraud, deceit, intimidation or deliberate disparagement. *See id.* 278 Ill.App.3d at 618, 663 N.E.2d at 8.

The parties do not appear to disagree that Nu-Tecsys met its burden with respect to the first two elements of the cause of action. Karl-Heinz testified at length about his expectations of making MIG gun sales to existing and new customers. (Tr. 729-40, 764-72.) Bridges knew that many of Nu-Tecsys' existing and prospective customers would be in attendance at the Detroit Show; indeed, the Detroit Letter was addressed to Exhibitors at the show. (Tr. 845; Def. Exs. 1001, 1066.) Where the parties disagree is whether the jury could have reasonably concluded that Binzel U.S.'s activity constituted purposeful interference or protected competitive activity.

Relying on *A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1405 (7th Cir. 1992), Plaintiff, without referring at all to the Detroit Letter, argues that Bridges' intimations fall within the competitor's business exception. *A-Abart* involved a defendant retailer who told a manufacturer it would not carry its new product line if such products were also to be made available through its competitor, plaintiff retailer. *See id.* at 1401. The Seventh Circuit held that defendant's activity of advancing its interests at the expense of its competitor fell within the competitor's privilege exception to the tort of intentional interference with prospective economic advantage. *See id.* at 1405. The court is inclined to agree with Binzel U.S. that Bridges' intimations that distributors would be cut off if they dealt with Nu-Tecsys are similar to the activity found to be privileged in *A-Abart*. Nu-Tecsys did not establish that Binzel U.S. acted solely with ill will; the evidence shows that Binzel U.S. had an across-the-board policy barring distributors from promoting a competitor's product. (Tr. 922-925.)

Nevertheless, Nu-Tecsys argues that the jury could have concluded that the Detroit

Letter alone met the third element of the intentional interference with prospective economic advantage and unfair competition causes of action. Binzel U.S. does not rebut this argument, and the court finds it persuasive. As discussed earlier, the evidence supports a finding that the Detroit Letter contained false information. Deceit or fraud is never a protected business activity. *See Soderlund*, 278 Ill.App.3d at 616, 663 N.E.2d at 8. Moreover, Karl-Heinz testified that Binzel U.S. employees "stormed" the Nu-Tecsys booth at the Detroit show, causing existing and prospective customers to leave. (Tr. 980-83.) A reasonable jury could have inferred that Binzel U.S. either intimidated these customers, or disparaged Nu-Tecsys, both unprivileged business activities. *See Soderlund*, 278 Ill.App.3d at 616, 663 N.E.2d at 8.

Finally, with respect to the damage element of the claims, Karl-Heinz testified regarding Nu-Tecsys' decline in sales and poor performance beginning with the Detroit show. (Tr. 728-44, 764-72.) Therefore, the court concludes that sufficient evidence, based solely on conduct surrounding the Detroit show, supports the jury's finding of liability on Nu-Tecsys' unfair competition and tortious interference counterclaims.

### E. Evidence Supporting Finding on Consumer Fraud Act and Bad Faith

The elements of a claim under the Illinois Consumer Fraud Act are the same as those under the Lanham Act with the added element that the tortfeasor intend that consumers rely on the deception. *See Thacker v. Menard, Inc.*, 105 F.3d 382, 386 (7th Cir. 1997) (listing elements of cause of action under the Illinois Consumer Fraud Act). Binzel U.S. argues that because Nu-Tecsys failed to show that the Detroit Letter was false or misleading under the Lanham Act, this Illinois law claim is not supported by the evidence. Because the court has

already determined that a reasonable jury could have found the counterfeit statement in the Detroit Letter false, the court will consider whether the evidence supports a finding that Binzel U.S. intended that customers rely on the statements. With regard to intent, the jury specifically found that the statements in the Detroit Letter were made in bad faith. (Verdict Form, Question B3.) This finding and the circumstances surrounding the distribution of the Letter support the inference that Binzel U.S. intended that consumers rely on the Detroit Letter and not do business with Nu-Tecsys. The remaining question, then, is whether the jury's finding of bad faith is supported by the evidence.

The Detroit Letter referred to Nu-Tecsys' goods as "counterfeit product." As confirmed by answers to interrogatories, Binzel itself never alleged that Nu-Tecsys counterfeited its MIG guns. (Def. Exs. 1067, 1068.) The jury could properly have inferred that Binzel U.S. never believed Nu-Tecsys' goods to be counterfeit, and made the counterfeit statement in the Detroit Letter knowing it was not true, e.g., in bad faith.

In so concluding, the court notes that it is unpersuaded by Binzel U.S.'s objections to the Verdict Form. Binzel U.S. argues that the jury was not asked to specify the basis for its finding of bad faith, and therefore, the jury may have improperly based its finding on Bridges' intimations and the Canada Letter, conduct Binzel U.S. argues is lawful. Question B3 of the Verdict Form, however, specifically asks the jury to consider, if they answered "yes" to Questions B1 and B2, whether the false or misleading statements were made in bad faith. Questions B1 and B2 both specifically ask the jury whether the statements in the Detroit letter were false or misleading. Therefore, the jury did specify its basis for its finding of bad

faith -- the jury determined that the false statements in the Detroit Letter were made in bad faith.

For the foregoing reasons, Binzel U.S.'s motion for judgment as a matter of law is denied. In accordance with Federal Rule of Civil Procedure 59(e), however, the court amends the judgment entered on July 9, 1999 so that judgment is entered against Binzel U.S. only, and not against Binzel Germany. The jury specifically found that Binzel Germany was not responsible for the content of the Detroit Letter, the basis for Binzel U.S.'s liability. (Verdict Form, Question B4.) Binzel U.S.'s motion to amend the judgment is granted.

## II. Counter-Defendant's Motion For A New Trial

Binzel U.S. sets forth two bases for ordering a new trial: it argues that a new trial is warranted because the Canada Letter was improperly admitted into evidence; and it urges this court to grant a new on trial on damages, arguing that the $4 million verdict was excessive and not supported by the evidence.

### A. Standard of Review

A motion for a new trial under Federal Rule of Civil Procedure 59 should be granted when "the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *See Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1367 (7th Cir. 1996) (quoting *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 516 (7th Cir. 1993)).

### B. Introduction of Canada Letter

Binzel U.S. argues that the Canada Letter should have been excluded from evidence

because Nu-Tecsys failed to produce the letter in discovery and failed to identify the letter in the pre-trial order. Binzel U.S. further contends that this erroneous evidentiary ruling resulted in an unfair trial and therefore constitutes grounds for the granting of a new trial on Nu-Tecsys' counterclaims. Nu-Tecsys responds that it was Binzel U.S. who should have produced the Canada Letter in discovery. According to Nu-Tecsys, counsel chose not to list the Canada Letter in the final pre-trial order because the letter's primary purpose was to impeach Bridges' testimony.

### 1.    Discovery of the Canada Letter

Binzel U.S. requested from Nu-Tecsys production of "all documents tending to support the loss of customers by Nu-Tecsys due to the conduct of [Counter-Defendant] complained of in this action." ([Counter-Def.'s] Memo in Support of Mot. for J. as a Matter of Law and for a New Trial, at 14 n.7, referring to Document Request No. 55.) Binzel U.S. argues that the Canada Letter fell within the scope of production requests made to Nu-Tecsys but was never produced, despite Nu-Tecsys' obligation to supplement discovery responses.

In response, Nu-Tecsys argues that the letter was drafted by Bridges, and subsequently signed by a representative of Binzel Canada, and therefore should have been produced in response to Nu-Tecsys' own discovery requests for documents in Binzel U.S.'s possession, but was instead withheld by Binzel U.S. Moreover, Nu-Tecsys contends it had no duty, once it came into possession of the letter, to supplement Document Request No. 55 because that request sought documents relating to sales figures and the like, not copies of Binzel U.S.'s own documents.

The court concludes that prompt production by Nu-Tecsys of the Canada Letter may well have been the safest course. Nevertheless, the court believes Nu-Tecsys' failure to produce a document generated by Binzel U.S.'s own key witness did not violate the discovery rules. The court recognizes that a party seeking discovery "is not limited to facts exclusively or peculiarly within the knowledge of the opponent. This is true even where the interrogator has at his disposal an adequate or even better source of information." *See Onofrio v. American Beauty Macaroni Co.*, 11 F.R.D. 181, 183 (W.D. Mo. 1951). *Accord United States v. 58.16 Acres of Land*, 66 F.R.D. 570, 573 (E.D. Ill. 1975); *Rowe Spacarb, Inc. v. Cole Products Corp.*, 21 F.R.D. 311, 312 (N.D. Ill. 1957); *Grand Opera Co. v. Twentieth Century-Fox Film Corp.*, 21 F.R.D. 39, 40 (E.D. Ill. 1957). The cases cited by Binzel U.S. for this principle are distinguishable, however; each holds that even if the discovering party has a better source of the information sought already in its possession, the party responding to the discovery request is still obligated to comply. In this case, the court concludes Binzel U.S. should have had in its possession not only a source of the information requested, but the original version of the Canada Letter. Nor does the court agree that the Canada Letter, a document that Binzel U.S.'s main witness himself drafted, falls within a request for documents reflecting Nu-Tecsys' sales.

### 2. Canada Letter Not Included In Pre-Trial Order

Binzel U.S. urges the court to order a new trial because the jury considered improperly admitted evidence that was not included in the pre-trial order. Nu-Tecsys responds that the Canada Letter was properly offered to impeach Bridges' credibility as a witness, and was

therefore properly excluded from the pre-trial order. In response, Binzel U.S. submits that the Canada Letter was not used solely for impeachment purposes, but was used as substantive evidence in Nu-Tecsys' affirmative case.

This court's Final Pretrial Order form requires parties to identify all exhibits in the pretrial order "except rebuttal exhibits," *see* LOCAL R. 16.1.1. The Federal Rules, likewise, require pretrial disclosure of all exhibits to be used "other than solely for impeachment," *see* FED. R. CIV. P. 26(a)(3). Under Federal Rule of Civil Procedure 37(c)(1), evidence not disclosed pursuant to Rule 26(a) must be excluded. The Seventh Circuit has held that "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *See Salgado by Salgado v. General Motors Corp.*,150 F.3d 735, 742 (7th Cir. 1998).

It is true that Nu-Tecsys initially offered the Canada Letter to impeach Bridges' testimony that he never saw the letter, a letter which he actually later admitted to drafting. It is equally true that the statements in the letter had substantive value with respect to Nu-Tecsys' affirmative case on most of its claims. Relying on a First and a Fifth Circuit case, Binzel U.S. contends that evidence which is used both for impeachment and for substantive purposes must be disclosed before trial. *See Klonoski v. Mahlab*, 156 F.3d 255, 270 (1st Cir. 1998) (holding that evidence at issue was "at least in part substantive,. . . [it] did not fall within the 'solely for impeachment' exception of Fed. R. Civ. P. 26(a)(3)"); *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 537-38 (5th Cir. 1993)(vacating denial of motion for new trial where impeachment evidence was used as substantive evidence but not disclosed prior

to trial).

Although the Seventh Circuit has not explicitly ruled on this issue, two of its cases are at least instructive here. *DeBiasio v. Illinois Central Railroad*, 52 F.3d 678 (7th Cir. 1995), *cert. denied*, 516 U.S. 1157 (1996) involved claims under the Federal Employers' Liability Act and the Federal Safety Appliance Act. During the trial, the defendant railroad called a witness who had not been named in the pre-trial disclosures, but who had been qualified as an expert during pre-trial deposition. On direct examination, the defendant railroad's counsel asked the witness to authenticate an exhibit which would have impeached the testimony of one of plaintiff's witnesses. The plaintiff objected on the grounds that the defendant had not disclosed this witness or the exhibit as required by Federal Rule of Civil Procedure 26(a)(2) and this court's local rule. The defendant countered by arguing that insofar as the witness was authenticating the exhibit, he was merely an impeachment witness. The trial judge sustained the plaintiff's objection to testimony about the exhibit, but allowed the defendant's witness to testify as an expert. On appeal, the Seventh Circuit found that the trial judge abused his discretion in excluding the impeachment testimony, but that the error was harmless. *See id.* at 686. In concluding that the district court should have overruled plaintiff's the objection, the Court of Appeals suggested almost the opposite of what Binzel U.S. argues here; that it is an abuse of discretion to exclude evidence that is offered for impeachment purposes, even if that same evidence has substantive value as well. Like the Canada Letter in this case, the evidence at issue in *DeBiasio* was not offered to prove an essential element of the affirmative claims, but for impeachment purposes. *See id.*

More recently, the Seventh Circuit considered this issue in a different context and reached a different result. In *Wilson v. AM General Corp.*, 167 F.3d 1114 (7th Cir. 1999), an employment discrimination case, the defendant sought leave to call two witnesses not disclosed on its witness list, arguing that these two witnesses were to be called only for impeachment purposes. The district court denied the request, concluding that the two witnesses were not merely rebuttal witnesses because these two individuals were qualified to testify to the allegedly nondiscriminatory reasons for the defendant's decision to discharge the plaintiff. *See id.* at 1122. On appeal, the Seventh Circuit held that the trial judge did not abuse his discretion in so ruling. *Id.* Finding that the proposed testimony was part of the defendant's primary line of defense, the Court of Appeals concluded that the two witnesses should have been named in the Rule 26 pretrial disclosures. *Id.*

Neither of these cases is directly relevant here. In the absence of controlling authority, the court declines to affirmatively decide the issue here. Even if the evidentiary ruling admitting the Canada Letter was erroneous, the court has already determined that a reasonable jury could have found for Nu-Tecsys on its counterclaims based on evidence other than the Canada Letter, and therefore its introduction was harmless. *See DeBiasio*, 52 F.3d at 685 ("An erroneous evidentiary ruling is harmless . . . 'unless there is a significant chance that it has affected the result of the trial.'")(quoting *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 313 (7th Cir. 1986); FED. R. CIV. P. 61; FED. R. EVID. 103(a)). Furthermore, the violation of a pretrial order does not warrant a new trial unless "the violation so surprised the party complaining of it that it denied that party a fair hearing." *Exxon Corp. v. Exxene*

*Corp.*, 696 F.2d 544, 548 (7th Cir. 1982). Binzel U.S. can not make such a showing with respect to a document that its own key witness authored.

Binzel U.S.'s motion for a new trial on the grounds that the court erroneously admitted the Canada Letter into evidence is denied.

## C.    Counter-Defendant's Motion for New Trial on Monetary Relief

Finally, Binzel U.S. urges the court to order a new trial on damages, arguing that the jury's award was based on insufficient evidence, and was unreasonably speculative and excessive. The jury awarded Nu-Tecsys $1.81 million dollars for lost profits and $3.03 million dollars in Binzel U.S.'s wrongful profits, totaling $4.84 million. The jury reduced this figure to $4 million to account for the overlap between Nu-Tecsys' lost profits and Binzel U.S.'s wrongful profits. Nu-Tecsys contends that this award is supported by the evidence. A jury's damages award should stand unless there is "no rational connection between the evidence on damages and the verdict." *See Mercado v. Ahmed*, 974 F.2d 863, 866 (7th Cir. 1992) (quoting *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 716 (7th Cir. 1985)).

### 1.    Evidence of Nu-Tecsys' Lost Profits

As Nu-Tecsys emphasizes, Karl-Heinz described sales lost to specific, identifiable customers and prospective customers during his testimony. (Tr. 728-44, 764-72.) Some of this testimony was stricken as hearsay and the credibility of some of this testimony was put challenged during cross-examination. Nevertheless, on the ultimate issue of lost sales damages, Karl-Heinz testified to an estimated lost sales of $150,000 per year from 1991 to 1998, totaling $1.2 million in lost sales during the relevant time period. (Tr. 796.) Karl-Heinz

further testified that after expenses, Nu-Tecsys' profit margin is approximately fifteen percent of gross revenue. (Tr. 795-96.) Lost profits on the claimed $1.2 million in lost sales can therefore be estimated at $180,000 (fifteen percent of $1.2 million). Because the jury found that Nu-Tecsys suffered $1.81 million in damages for lost profits, it is clear that their verdict was not based on Karl-Heinz's testimony regarding lost sales to identifiable individual customers. Rather, it is apparent that the jury's verdict on Nu-Tecsys' lost damages was based on Karl-Heinz's projections of what Nu-Tecsys hoped to earn between 1991 and 1998. The court must determine, then, whether the evidence forming the basis of this award was sufficient to support the verdict. Even considering the evidence in a light favorable to the jury's verdict, the court concludes that the evidence was speculative.

The evidence at trial established that between the years 1991 and 1998, Nu-Tecsys earned revenue between $1.3 million and $1.8 million per year. (Tr. 1271.) Karl-Heinz testified that in 1990, he projected Nu-Tecsys' sales to increase to between $4 and $7 million annually. (Tr. 713.) Nu-Tecsys submitted no corroborating evidence that it ever made such a projection in 1990. Furthermore, Karl-Heinz claims to have based this projection only on his previous experience as President at Binzel U.S. and "the feedback we got from our distributors, the feedback we got back from our advertising, and simply from comments." (Tr. 711.)

First, Nu-Tecsys does not point to any evidence in the record showing that during Karl-Heinz's tenure as President of Binzel U.S., the company experienced a "very nice gradual increase" in sales. (Tr. 711.) This projection is highly speculative and not proven by

"methodologies that . . . [do] not insult the intelligence." *See Zazu Designs v. L'Oreal*, S.A., 979 F.2d 499, 505 (7th Cir. 1992). Indeed, Nu-Tecsys points to no evidence showing how the estimates were generated, nor any evidence that adjustments were made in the estimates reflecting inflation or an increase in the price of materials. Nor does Nu-Tecsys provide evidentiary support for the suggestion that Nu-Tecsys' experience should have paralleled the success achieved while Karl-Heinz was at the helm of Binzel U.S.

Nor has Nu-Tecsys offered support for the notion that the sole factor that prevented Nu-Tecsys from achieving its goals was the conduct of Binzel U.S. Instead, the jury must have made a "leap of faith" to believe that in determining Nu-Tecsys would have earned two to five times the amount of revenue during the relevant years, had Binzel U.S. not engaged in unlawful conduct. *See id.* at 506 (in calculating an award of compensatory damages, "[a]llowance for uncertainty is one thing . . . and rank speculation is another."); *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1368 (7th Cir. 1996) (an award must be based on the record and cannot be based on "leaps of faith"); *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738 (7th Cir. 1985) ("The plaintiff failed to produce any evidence supporting its assumption that, 'it is reasonable to expect Otis Clapp to continue to grow at its historical rates.'"). Simply put, the evidence does not support this award.

Second, the award is also speculative because Karl-Heinz could not reasonably project the growth of Nu-Tecsys based on the past performance of Binzel U.S. Under Illinois law, a new business, or an existing business with a new product, cannot recover lost profits because the future profits of a new business cannot be ascertained with any degree of

certainty. *See Stuart Park Assocs. Ltd. Partnership v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995); *Drs. Selke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*, 143 Ill.App.3d 168, 174, 491 N.E.2d 912, 917 (2nd Dist. 1986). Nu-Tecsys falls under this "new business rule" because it had entered into the MIG market only seven months prior to the time of the filing of the lawsuit. (Tr. 715-16.) Past success in a similar enterprise does not alone provide a "self-evident basis for generalizations" about projected sales. *See Stuart Park*, 51 F.3d at 1328; *see also Drs. Selke & Conlon*, 143 Ill.App.3d at 174, 491 N.E.2d at 917 ("The long-standing rule in Illinois is that lost profits may be a measure of damages where a business is interrupted, but the business must have been established prior to the interruption so that the evidence of lost profits is not speculative." (citations omitted)). Therefore, Karl-Heinz's fourteen years as President for Binzel U.S. do not provide the evidentiary basis necessary to support the jury's verdict on lost profits to Nu-Tecsys in the amount of $1.8 million.

## 2. Evidence of Binzel U.S.'s Wrongful Profits

Under the Lanham Act, once the alleged wrongdoer has been found liable, the prevailing party may receive damages reflecting the wrongdoer's profits gained from the unlawful conduct. *See Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1205 (7th Cir. 1990). Disgorgement of the wrongdoer's profits may be awarded on three different bases: compensation, unjust enrichment or deterrence. *See Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1349 (7th Cir. 1994) (quoting *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 941 (7th Cir. 1989). Binzel U.S. argues that on any of the three rationales, the jury's verdict on wrongful profits cannot stand.

The court agrees with Binzel U.S.'s argument that unjust enrichment could not form the basis of the jury's verdict on wrongful profits. Under the Lanham Act, an award of the wrongdoer's profits must bear some relationship to the unlawful conduct - e.g., grounded in the benefit accruing to Binzel U.S. on account of its unlawful conduct. *See Sands, Taylor & Wood v. The Quaker Oats Co.*, 34 F.3d 1340, 1349 (7th Cir. 1994). Here, the amount of wrongful profits awarded by the jury exactly parallels the amount of profits Binzel U.S. earned on *all* its MIG sales during the relevant time period. (Tr. 1070.) The record shows that Binzel U.S. had made MIG sales prior to the issuance of the Detroit Letter. The court concludes that no reasonable jury could have found that Binzel U.S. was unjustly enriched by every single MIG sale it made from 1991 through 1998; put another way, not every MIG sale made by Binzel U.S. during this time was a direct result of its unlawful conduct towards Nu-Tecsys.

Having concluded that unjust enrichment does not furnish a basis for the jury's wrongful profits award, the court considers two other potential rationales for the verdict: compensation or deterrence. Binzel U.S. urges that compensation also does not furnish a basis for the award. According to Binzel U.S., disgorgement of wrongful profits is most appropriate when actual damages are otherwise minimal; a separate award for wrongful profits might over-compensate an injured party, "creating a windfall judgment at the [liable party's] expense." *See BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1096 (7th Cir. 1994) (quoting *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2nd Cir. 1992)). Nu-Tecsys' award of lost profits is not nominal here, and the court agrees that the additional

wrongful profits may fairly be characterized as a windfall. As noted, the jury's wrongful profits award to Nu-Tecsys amounts to the equivalent of Binzel U.S.'s total MIG sales during the relevant time period. Although the jury ultimately subtracted nearly $1 million from the total amount of damages awarded, representing an overlap in Binzel U.S.'s wrongful profits and Nu-Tecsys' lost profits, the court concludes that the jury award exceeds mere compensation to Nu-Tecsys for its injuries.

Finally, an award of wrongful profits may be appropriate to deter the liable party from continuing its wrongful conduct. *See Sands*, 34 F.3d at 1349. Nevertheless, the Lanham Act forbids the court from allowing a recovery that is so excessive as to constitute a penalty. *See* 15 U.S.C. § 1117; *see also Otis Clapp*, 754 F.2d at 744. Based on its bad faith finding, the jury could have inferred that Binzel U.S. continued its wrongful conduct through the time of the trial and intended to continue such conduct in the future. In these circumstances, an imposition of an award for purposes of deterrence is appropriate.

The court concludes, nevertheless, that the award here – which results in disgorgement of all Binzel U.S.'s MIG profits during the relevant years – is so excessive as to constitute a penalty. It appears that in attempting to deter Binzel U.S., the jury ordered the disgorgement of all its MIG profits during the relevant years. Rather than order a new trial on damages, however, the court will exercise its discretion to enter judgment for a sum that it finds just, according to the circumstances of the case. *See* 15 U.S.C. § 1117. First, the court concludes that Defendant adequately showed that it suffered an amount of lost profits equal to $180,000 from 1991 through 1998. The court also believes an award of wrongful profits is warranted

in these circumstances. Rather than attempt to arrive at a wrongful profits figure on its own, the court will reduce the final award of damages by $1.63 million. This amount is calculated by subtracting $180,000 from the $1.81 million lost profits award. In conclusion, the court reduces the final $4 million total award by $1.63 million, thereby also reducing the award for the amount of wrongful profits that constituted a penalty. Accordingly, the court orders remittitur, reducing Defendants' award of damages from $4 million to $2.37 million.

## III.  Counter-Plaintiff's Motions for Attorneys' Fees and Enhanced and Punitive Damages

Nu-Tecsys has moved the court for an award of enhanced damages under the Lanham Act, punitive damages under Illinois common law, and attorney's fees under the Lanham Act and under the Illinois Consumer Fraud and Deceptive Business Practices Act. Under the Lanham Act, a district court, in its discretion, may enhance the damage award when the violation indicates a need for deterrence, particularly when actual damages and profits are not easily ascertainable. *See Sands*, 34 F.3d at 1350-1352. Likewise, under Illinois law, punitive damages are justified in cases where a wrongdoer commits a tort with "actual malice." *See Martin v. Heinold Commodities*, 163 Ill.2d 33, 643 N.E.2d 734, 757. The standard for attorneys' fees is the same under both the federal and state statutory claims. *See Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 126 F.3d 1028, 1032 (7th Cir. 1997). A court can exercise its discretion to award attorneys' fees when a case "so lacked merit and was so burdensome to defend against that it could fairly be described as oppressive." *See id.* at 1030.

Without ruling on the merits of each of these motions, the court denies all three.

Given its ruling that the jury award is based, at least in part, on deterrence, the court declines to exercise its discretion to supplement that award with other damages and fees. To the extent any of Nu-Tecsys' damages and fees motions have merit, the court believes the award adequately reflects the need to deter wrongful conduct on the part of Binzel U.S.

## CONCLUSION

For the foregoing reasons, Binzel U.S.'s motion to amend the judgment (Doc. No. 297-1) is granted; Binzel U.S.'s motions for judgment as a matter of law (Doc. No. 298-1) and a new trial (Doc. No. 298-2) are denied; and Nu-Tecsys' motions for attorneys' fees and enhanced and punitive damages (Doc. Nos. 314-1, 2, 3) are denied. The court further orders that judgment against Binzel Germany be vacated, and that the award be reduced from $4 million to $2.34 million. Both parties' motions for directed verdict (Doc. No. 289-1) and (Doc. No. 290-1) are denied as moot. Finally, Nu-Tecsys' motion to lift the stay of judgment (Doc. No. 319-1) pursuant to FED. R. CIV. P. 62(b) is granted without prejudice.

ENTER:

Dated: March 23, 2000

REBECCA R. PALLMEYER
United States District Judge





# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 3953 | **DATE** | 3/23/2000 |
| **CASE TITLE** | Johnson vs. St. Bernard Hospital | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 4/7/00 at 10:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Mr. Nate F. Scarpelli's and his law firm's motion for leave to withdraw appearances as counsel for plaintiff is granted. Plaintiff shall appear in court at the next status hearing. A new date for filing the response to defendants' motion for summary judgment will be set at the next status.

(11) ☑ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | MAR 24 2000 | date docketed | |
| ✓ | Docketing to mail notices. | | | | 40 |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| MPJ | courtroom deputy's initials | 00 MAR 23 PM 6:12 | Date/time received in central Clerk's Office | mailing deputy initials | |

# United States District Court
# Northern District of Illinois

In the Matter of

Johnson

v.

St. Bernard Hospital, et al.

Case No. 98 C 3953

Designated Magistrate Judge
Martin C. Ashman

DOCKETED

MAR 2 4 2000

## ORDER GRANTING RELIEF FROM
## PRO BONO APPOINTMENT

The request of **Nate F. Scarpelli** for relief from appointment as counsel for **Terrry Johnson** in accordance with Local Rule 83.38A of this Court is granted. In addition, counsel's name shall be returned to the current pro bono panel for possible appointment in another case during the current panel year.

_Elaine E. Bucklo_

Judge Elaine E. Bucklo

Dated: March 23, 2000